UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JONATHON FAUL, | |
| Plaintiff, | Case No. 25-cv-12161 |
| vs. | |
| TEGNA INC., MICHAEL STEIB, HOWARD D. ELIAS, GINA L. BIANCHINI, CATHERINE DUNLEAVY, STUART J. EPSTEIN, KAREN H. GRIMES, SCOTT K. MCCUNE, HENRY W. MCGEE, NEAL B. SHAPIRO, DENMARK WEST, and MELINDA D. WITMER, | |
| Defendants. | |

## COMPLAINT

Plaintiff Jonathon Faul ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against TEGNA Inc. ("Tegna" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Tegna, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed

acquisition of Tegna by Nexstar Media Group, Inc. ("Parent") and Teton Merger Sub, Inc. ("Merger Sub" and, together with Parent, "Nexstar").

2.     On or about August 18, 2025, Tegna entered into an agreement and plan of merger (the "Merger Agreement"), whereby Nexstar will acquire Tegna (the "Proposed Transaction") and shareholders of Tegna common stock will receive $22.00 in cash for each share of Tegna common stock they own (the "Merger Consideration").

3.     On or about September 17, 2025, in order to convince Tegna's shareholders to support the Proposed Transaction, the Board authorized the filing of a Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") with the Securities and Exchange Commission ("SEC"). As detailed below, the Proxy Statement is materially incomplete and misleading with respect to: (i) the background of the merger process and the valuations contemplated by the proposals submitted by another potential counterparty, (ii) the financial fairness of the Proposed Transaction, and (iii) the potential conflicts of interest that may have tainted the work performed by Tegna financial advisor Allen & Company ("Allen & Co.") and the fairness opinion that Allen & Co. provided.

4.     The special meeting at which Tegna shareholders will cast their votes on the Proposed Transaction (the "Special Meeting") will be scheduled and the definitive proxy statement that will be used to solicit votes on the Proposed Transaction will be sent to Tegna shareholders shortly.  It is imperative that the material information that has been omitted from the Proxy Statement be disclosed immediately so public stockholders may have time to consider the information that has been omitted and misrepresented in the Proxy Statement and make a fully and fairly informed determination as to how to vote.

5.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin

Defendants from consummating the Proposed Transaction, unless and until the material information discussed below is disclosed to Tegna's shareholders, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Vigman*, 764 F.2d at 1316.

8.    Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(2) because Defendants are subject to personal jurisdiction in this District, Nexstar maintains corporate offices in this District, and shareholders of Tegna reside in this District so Defendants were aware that the Proxy Statement would be reviewed in this District. *See Sarantakis v. Gruttadauria*, No. 02 c 1609, 2003 U.S. Dist. LEXIS 4002, at *23 (N.D. Ill. Mar. 17, 2003) ("Venue is appropriate in a securities case where a defendant causes false or misleading

information to be transmitted into a judicial district."); *see also Oxford First Corp. v. PNC Liquidating Corp.*, 372 F. Supp. 191, 197 (E.D. Pa. Mar. 6, 1974) ("Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district."); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 106 (10th Cir. 1971) (finding venue proper in the District of Utah where the defendant released a false and fraudulent press statement that was printed in the Wall Street Journal that was circulated in Salt Lake City, Utah).

## PARTIES

9.      Plaintiff is, and has been continuously throughout all times relevant hereto, an owner of Tegna common stock.

10.      Defendant Tegna is a media company specializing in local news operating 64 television stations in 51 U.S. markets, reaching more than 100 million people monthly across the web, mobile apps, connected TVs, and linear television.  Tegna's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "TGNA."

11.      Defendant Michael Steib ("Steib") is Tegna's President and Chief Executive Officer, and a director of the Company.

12.      Defendant Howard D. Elias ("Elias") is a director of the Company.

13.      Defendant Gina L. Bianchini ("Bianchini") is a director of the Company.

14.      Defendant Catherine Dunleavy ("Dunleavy") is a director of the Company.

15.      Defendant Stuart J. Epstein ("Epstein") is a director of the Company.

16.      Defendant Karen H. Grimes ("Grimes") is a director of the Company.

17.      Defendant Scott K. McCune ("McCune") is a director of the Company.

18.      Defendant Henry W. McGee ("McGee") is a director of the Company.

4

19.     Defendant Neal B. Shapiro ("Shapiro") is a director of the Company.

20.     Defendant Denmark West ("West") is a director of the Company.

21.     Defendant Melinda C. Witmer ("Witmer") is a director of the Company.

22.     The defendants identified in paragraphs 11 through 21 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

### A.  Background of the Proposed Transaction

23.     Defendant Tegna is a media company specializing in local news operating 64 television stations in 51 U.S. markets, reaching more than 100 million people monthly across the web, mobile apps, connected TVs, and linear television.  Tegna's common stock trades on the NYSE under the ticker symbol "TGNA."

24.     Tegna is one of the nation's largest producers of local news, producing more than 1,700 hours of news per week and also has network affiliation and local sports rights agreements through which Tegna carries popular sports content, including professional collegiate sports and the Olympics.

25.     In February 2022, Tegna entered into a definitive merger agreement pursuant to which Tegna would have been acquired by affiliates of Standard General L.P. (the "Standard General Merger Agreement") but, after regulatory review, Tegna terminated the Standard General Merger Agreement.

26.     In the months following the 2024 U.S. presidential election, Tegna had preliminary discussions with several potential counterparties regarding possible strategic transactions but none of these discussions related to an acquisition of Tegna.  Tegna engaged Allen & Co. as its financial advisor to assist the Board and Tegna senior management in the evaluation of these potential

opportunities.

27.     In January 2025, Tegna senior management began engaging with Nexstar senior management regarding a potential strategic transaction.

28.     On May 13, 2025, Nexstar proposed to acquire Tegna in a cash/stock mix transaction that valued Tegna at $20.00 per share, with 80% of the consideration payable in cash and 20% of the consideration payable in shares of Nexstar common stock.

29.     On May 22, 2025, representatives of Tegna informed representatives of Nexstar that "a proposal providing for Nexstar to acquire all of the outstanding shares of TEGNA Common Stock in an all-cash transaction for a per share price of $22.50 could provide a basis for further engagement, subject to the determination of the Board of Directors."  Proxy Statement at 28.

30.     On May 30, 2025, representatives of Nexstar proposed to acquire Tegna in an all-cash transaction at $22.00 per share.

31.     During the next several months, Tegna and Nexstar negotiated the terms of the Proposed Transaction and the Merger Agreement at $22.00 per share.

32.     On August 6, 2025, the chief executive officer of a broadcasting industry participant identified in the Proxy Statement as Party A contacted Defendant Steib, asking to schedule a telephone call.

33.     On August 8, 2025, this telephone call occurred, and the chief executive officer of Party A informed Defendant Steib that Party A was considering strategic alternatives, including a potential business combination with Tegna.

34.     That same day, August 8, 2025, *The Wall Street Journal* reported that Nexstar was in talks to acquire Tegna.

35.     On August 9, 2025, the chief executive officer of Party A contacted Defendant Steib

and informed him that Party A intended to make a proposal for a business combination with Tegna.

36. On August 11, 2025, the chief executive officer of Party A contacted Defendant Steib and made an informal verbal proposal under which Tegna and Party A would enter into a business combination whereby one of Party A's business units would merge with TEGNA in an all-stock transaction, with the combined company assuming the indebtedness of each of TEGNA and Party A.

37. On August 14, 2025, the chief executive officer of Party A sent to Defendant Elias and Defendant Steib a non-binding proposal (the "Party A Proposal") for a business combination whereby Party A would spin-off certain assets not related to the broadcasting industry, followed by an all-stock merger between TEGNA and Party A, with TEGNA Stockholders owning 55-60% of the combined company and stockholders of Party A owning 40-45% of the combined company. Defendant Elias and Defendant Steib informed Party A that the Tegna Board would review the Party A Proposal.

38. On August 18, 2025, the Tegna Board held a special meeting at which it reviewed and rejected the Party A Proposal and then proceeded to enter into the Merger Agreement with Nexstar and resolve to recommend the Proposed Transaction for approval by Tegna's stockholders.

39. Because the Company was just finally beginning to emerge from these headwinds, its stock price did not fully reflect its growth prospects during the time leading up to the announcement of the Proposed Transaction.

**B.** **The Proposed Transaction and the Issuance of the Materially Incomplete and Misleading Proxy Statement**

40. On or about August 19, 2025, Tegna and Nexstar issued a joint press release to announce the Proposed Transaction, stating in part:

**Nexstar Media Group, Inc. Enters into Definitive Agreement to Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction**

August 19, 2025

**Enhances Nexstar's Position as a Leading Local Media Company**

**Preserves High-Quality Local Journalism and Diversity of Opinion**

**Strengthens Ability to Compete with Big Tech and Big Media**

**Expected to Drive Increased Profitability and Returns for Nexstar Shareholders**

**IRVING, Texas and TYSONS, Viriginia (Aug. 19, 2025)** – Nexstar Media Group, Inc. (Nasdaq: NXST) ("Nexstar") and TEGNA Inc. (NYSE: TEGNA) ("TEGNA") announced today that they entered into a definitive agreement (the "Agreement") whereby, subject to regulatory approvals, Nexstar will acquire all outstanding shares of TEGNA for $22.00 per share in a cash transaction valued at $6.2 billion, inclusive of TEGNA's net debt and estimated transaction fees and expenses. The purchase price represents a 31% premium to TEGNA's average 30-day average stock price ending August 8, 2025, the last closing stock price prior to media reports of a potential transaction. Following completion of the transaction, the combined entity will be a leading local media company, well-positioned to compete in today's fragmented and rapidly evolving marketplace. The new company will be better able to serve communities by ensuring the long-term vitality of local news and programming from trusted local sources and preserving the diversity of local voice and opinion. Nexstar will also be able to provide advertisers with an even greater variety of competitive local and national broadcast and digital advertising solutions to serve brands and consumers more effectively.

Nexstar's Chairman and Chief Executive Officer, Perry A. Sook, commented, "The initiatives being pursued by the Trump administration offer local broadcasters the opportunity to expand reach, level the playing field, and compete more effectively with the Big Tech and legacy Big Media companies that have unchecked reach and vast financial resources. We believe TEGNA represents the best option for Nexstar to act on this opportunity. TEGNA is a premier operator with high quality local television stations primarily in the top 75 DMAs. We and TEGNA are similarly dedicated to providing communities of all sizes with the best programming and fact-based local journalism along with innovative digital products and marketing solutions for local viewers and advertisers. The transaction will increase Nexstar's reach through the expansion of our presence in important DMAs such as Atlanta, Phoenix, Seattle, and Minneapolis, as well as enhance our local presence, enabling us to continue to provide the core local news and programming that is in the public's interest."

Mr. Sook continued, "Nexstar has a stellar long-term record of growth through its deals, having completed many well-received transactions since 2011, including the 2019 acquisition of Tribune Media. The playbook we followed to make those transactions successful – improving and increasing local content, executing on identified synergies, and quickly de-leveraging our balance sheet with free cash flow post close – are the same opportunities and strategies we will use in connection with this transaction. With committed financing and a plan for significant synergy realization, we believe the combined entity will be poised for growth, leverage reduction, and the enhancement of shareholder value."

Howard Elias, Chairman of TEGNA's Board of Directors commented, "At TEGNA, we share Nexstar's commitment to local broadcasting, exemplified by numerous investments and initiatives, industry journalism awards, and the significant expansion of our local news content. This transaction, which will provide premium near-term value to TEGNA shareholders, comes at a time of rapid change in our industry and reflects the fact that policymakers of all perspectives are calling for regulations governing our industry to be modernized. This transaction with Nexstar will further solidify the critical role our stations serve in our communities, preserve their trust, and be better able to compete in today's highly fragmented media environment."

Mike Steib, Chief Executive Officer of TEGNA, said, "We are thrilled to have found a partner in Nexstar that will enable TEGNA's stations to continue doing what we do best: creating outstanding and impactful local content coupled with the delivery of indispensable digital products to the communities we serve around the country. Nexstar and TEGNA both share a rich heritage of commitment to journalistic excellence and technological advancements. Together, we will expand news coverage to serve more communities, across more screens, and ultimately secure the future of local news for generations to come."

**Transaction Details**

- TEGNA purchase price of $22.00 per share, reflects a 31% premium to TEGNA's unaffected 30-day average stock price ending August 8, 2025.

- Transaction has been unanimously approved by TEGNA's Board of Directors.

- TEGNA debt will be refinanced and/or assumed at close.

- Committed financing in place from BofA Securities, J.P. Morgan Chase N.A., and Goldman Sachs & Co. LLC to finance the transaction.

**Transaction Highlights**

- Combines two best-in-class television broadcast companies which share an unwavering commitment to localism, innovation, and superior, trustworthy programming.

- ***Increases operational and geographic diversity and scale.*** Upon closing, Nexstar, together with its partners, will have 265 full-power television stations in 44 states and the District of Columbia and 132 of the country's 210 television DMAs. The combined company will have stations in 9 of the top 10 DMAs, 41 of the top 50 DMAs, 62 of the top 75 DMAs and 82 of the top 100 DMAs, covering, in total, 80% of U.S. television households.

- ***Enhances presence in local DMAs.*** Nexstar's station footprint overlaps with TEGNA in 35 of TEGNA's 51 DMAs, providing improved synergy potential in these markets.

- ***Extends footprint to additional contested election DMAs.*** The addition of strong Big-4 affiliates in key contested election DMAs, such as Phoenix, AZ, Atlanta, GA, Toledo, OH, and Portland, ME, will enhance the political advertising outlook for Nexstar in even-numbered years.

**Financial Summary and Outlook**

- On a combined basis for the last eight quarters annualized ending June 30, 2025, Nexstar, together with TEGNA, would have combined net revenue (excluding synergies) of $8.10 billion and combined Adjusted EBITDA (excluding synergies) before stock-based compensation of $2.56 billion.

- Based on our estimates for 2025, Nexstar expects to generate annual net synergies of approximately $300 million from a combination of revenue synergies and net operating expense reductions.

- Together, the Adjusted Free Cash Flow of TEGNA, the expected synergies on an after-tax basis and the estimated after-tax financing costs related to the transaction, is expected to be more than 40% accretive to Nexstar's standalone Adjusted Free Cash Flow in the first twelve months after closing.

- After giving effect to the transaction, the incurrence of transaction-related debt, transaction expenses, and expected synergies, Nexstar expects its net leverage ratio to be approximately 4x at closing with de-leveraging to current leverage levels in 2028. As of June 30, 2025, Nexstar's total net leverage ratio was 3.19x.

- Consistent with past transactions, Nexstar initially intends to allocate excess free cash flow to repay debt.

**Timing and Approvals**

- The transaction is subject to customary closing conditions, including TEGNA shareholder and regulatory approvals.

- The transaction is expected to close by the second half of 2026.

**Advisors**

BofA Securities, J.P. Morgan Securities LLC, and Goldman Sachs & Co. LLC are acting as financial advisors and Kirkland & Ellis LLP, Wiley Rein LLP, and Morrison Foerster are acting as legal counsel to Nexstar.

Allen & Company LLC is acting as financial advisor to TEGNA and Wachtell, Lipton, Rosen & Katz, and Covington & Burling LLP are acting as its legal counsel.

41. On or about September 17, 2025, Tegna, in order to solicit approval to consummate the Proposed Transaction from Tegna's public shareholders, the Board authorized the filing of the Proxy Statement with the SEC.

42. The Proxy Statement is materially incomplete and misleading.

**C.    The Materially Incomplete and Misleading Proxy Statement**

43. The Proxy Statement is materially incomplete and misleading with respect to (i) the background of the merger process and the valuations contemplated by the Party A Proposal, (ii) the financial fairness of the Proposed Transaction, and (iii) the potential conflicts of interest that may have tainted the work performed by Tegna financial advisor Allen & Co. and the fairness opinion that Allen & Co. provided.

**i.   The Proxy Statement is Materially Misleading as to the Party A Proposal**

44. The Proxy Statement indicates that Party A first approached Tegna on August 6, 2025 and informed Tegna that it was considering proposing a business combination with Tegna on August 8, 2025.

45. The Proxy Statement further indicates that later on that same day, August 8, 2025, the *Wall Street Journal* reported that Nexstar and Tegna were in talks, and that Party A made verbal

and written indications of interest in a stock-based merger with Tegna pursuant to which Party A would spin off certain assets not related to the broadcasting industry and then Tegna and Party would merge, with Tegna stockholders owning 55-60% of the combined company and stockholders of Party A would own 40-45% of the combined company.

46.     The Proxy Statement indicates that, just days later and apparently without even informing Party A that it was rejecting Party A's proposal, the Board decided to move forward with the Proposed Transaction and sign the Merger Agreement.

47.     The Proxy Statement describes the Board's review of Party A's proposal at the same meeting as it resolved to enter into the Merger Agreement as follows:

> On August 18, 2025, the Board of Directors held a special meeting to discuss and consider whether to approve TEGNA's entry into definitive transaction documents providing for, among other things, the Merger, at which members of TEGNA senior management, representatives of Allen & Company, representatives of Wachtell Lipton and representatives of Covington & Burling LLP ("Covington"), FCC counsel to TEGNA, were present.  At the meeting, Mr. Elias and Mr. Steib provided an overview of recent developments since the Board of Directors' August 6, 2025 meeting, including updates regarding the ongoing discussions with respect to a potential transaction with Nexstar and the Party A Proposal.  Following this update, representatives of Wachtell Lipton discussed with the Board of Directors its fiduciary duties under Delaware law in connection with considering the approval of a potential sale of TEGNA and the consideration of the Party A Proposal.

> Following this discussion, Allen & Company provided an overview of Party A and the Party A Proposal, based on publicly available information.  During this overview, the Board of Directors discussed with TEGNA's senior management and legal and financial advisors the complexity and execution risk associated with the Party A Proposal, noting that pursuing such an opportunity would likely involve a complex negotiation regarding the allocation of assets and liabilities as between the portion of Party A's business that would be spun off prior to the consummation of a transaction, as well as other due diligence and the negotiation of definitive documentation.  The Board of Directors also discussed that the Party A Proposal provided for an all-stock transaction with uncertainty of value, as opposed to the all-cash transaction proposed by Nexstar, that would involve the combined company assuming substantial indebtedness in connection with the business combination contemplated by the Party A Proposal and, based on publicly available information, would be dilutive to TEGNA Stockholders.  Following this discussion, it was the consensus of the Board of Directors that it was not in the best interests of

TEGNA or its stockholders to pursue the Party A Proposal rather than the proposed all-cash acquisition of TEGNA by Nexstar for $22.00 per share, because, among other things, the Party A Proposal presented substantial execution risks, and the Board of Directors' view that the proposed $22.00 all-cash per share price of the Nexstar proposal provided superior and more certain value to TEGNA Stockholders than Party A's proposed all-stock combination.

Proxy Statement at 31-32.

48.     The Proxy Statement fails to disclose the valuation that the Party A Proposal actually implied for Tegna.[1]

49.     Upon information and belief, Party A's proposal was plainly superior for the Company's public investors from a financial point of view.

50.     Although the Proxy Statement does not identify Party A, upon information and belief, Party A is Sinclair Inc. ("Sinclair"). The *Wall Street Journal* has reported that in the time leading up to the signing of the Merger Agreement, Sinclair had proposed a business combination with Tegna which "would involve separating its Ventures unit, which includes the Tennis Channel and other non-broadcast assets, and combining its broadcast TV operations with Tegna" and "would value Tegna's shares at around $25 to $30 per share, compared with its $20.18 close on Monday[.]"[2]

51.     The fact that the Party A Proposal implied a much higher valuation for Tegna shares than the Merger Consideration that will be paid in the Proposed Transaction (and the extent to which the Board discussed this fact when it resolved to reject the Party A Proposal and move

---

[1] Notably, while Allen & Co. has opined that the Merger Consideration is fair from a financial point of view, its fairness opinion explicitly did not "otherwise address the merits of the underlying decision by TEGNA to engage in the Merger, *including in comparison to other strategies or transactions that might be available to TEGNA or which TEGNA might engage in or consider.*" Proxy Statement at 39.

[2] Ayushman Ojha, "Sinclair Offers to Merge TV Business with Tegna, WSJ Reports," Investing.com (publ. 08/18/2025) (available online: https://www.investing.com/news/stock-market-news/sinclair-offers-to-merge-tv-business-with-tegna-wsj-reports-4198951) (accessed Oct. 2, 2025).

forward with the Proposed Transaction without even attempting to negotiate different terms with Party A) is material information that is of obvious importance to the Company's stockholders and must be disclosed so that Tegna stockholders can cast their votes and a fully and fairly informed basis.

### ii. The Proxy Statement is Materially Incomplete and Misleading as to the Assumptions that Allen & Co. Relied Upon in Performing the Valuation Analyses Underlying Its Fairness Opinion

52. The Proxy Statement indicates that Allen & Co. performed a discounted cash flow analysis in connection with its fairness opinion.

53. The Proxy Statement purports to disclose the financial projections that Allen & Co. relied upon in performing its discounted cash flow analysis:

The following table presents a summary of the Projections:

| Revenue (in millions) | 2025E | 2026E | 2027E | 2028E | 2029E |
|---|---|---|---|---|---|
| Base Case | $2,767 | $3,072 | $2,689 | $3,067 | $2,608 |
| Optimistic Case | $2,797 | $3,236 | $2,949 | $3,486 | $3,065 |
| Pessimistic Case | $2,696 | $2,913 | $2,479 | $2,754 | $2,247 |
| Weighted Case | $2,759 | $3,073 | $2,699 | $3,088 | $2,627 |

| Adjusted EBITDA[1] (in millions) | 2025E | 2026E | 2027E | 2028E | 2029E |
|---|---|---|---|---|---|
| Base Case | $606 | $ 888 | $520 | $ 871 | $508 |
| Optimistic Case | $622 | $1,000 | $701 | $1,165 | $802 |
| Pessimistic Case | $566 | $ 776 | $379 | $ 652 | $292 |
| Weighted Case | $601 | $ 888 | $528 | $ 886 | $524 |

| Unlevered Free Cash Flow[2] (in millions) | 2025E | 2026E | 2027E | 2028E | 2029E |
|---|---|---|---|---|---|
| Base Case | $461 | $631 | $373 | $627 | $358 |
| Optimistic Case | $473 | $714 | $509 | $848 | $569 |
| Pessimistic Case | $431 | $547 | $267 | $463 | $193 |
| Weighted Case | $458 | $631 | $379 | $639 | $367 |

(1) "Adjusted EBITDA" is a non-GAAP financial measure, which was calculated as net income attributable to TEGNA before (i) net (income) loss attributable to redeemable non-controlling interest, (ii) interest income, (iii) other non-operating items, net, (iv) income taxes, (v) interest expense, (vi) merger termination fees, (vii) Octillion earnout adjustments, (viii) M&A-related costs, (ix) retention costs, (x) workforce restructuring expense, (xi) asset impairment and other, and (xii) depreciation and amortization.

(2) "Unlevered Free Cash Flow" is a non-GAAP financial measure, calculated by Allen & Company, using the financial information provided by TEGNA, for purposes of its discounted cash flow analysis (which was based on the Weighted Case), as Adjusted EBITDA (as shown in the table above), further adjusted by deducting payments made for (i) taxes (estimated cash tax expense on an unlevered basis), (ii) purchases of property and equipment, and (iii) changes in net working capital.

Proxy Statement at 44.

54.     Upon information and belief, the Proxy Statement does not disclose all of the cash flow projections that Allen & Co. relied upon in performing this analysis.

55.     The Proxy Statement indicates that "Allen & Company performed a discounted cash flow analysis of TEGNA by calculating, based on the TEGNA management Weighted Case **and other information provided by TEGNA management**, the estimated present value of the standalone unlevered, after-tax free cash flows that TEGNA was forecasted to generate during the fiscal years ending December 31, 2025 through December 31, 2029."  Proxy Statement at 42.

56.     The Proxy Statement further indicates that "[t]he implied terminal value of TEGNA was derived by applying to TEGNA's normalized unlevered, after-tax free cash flow for the fiscal year ending December 31, 2029 a selected range of perpetuity growth rates of (2.5)% to (1.5)%. The present values (as of June 30, 2025) of the cash flows and terminal values were then calculated using a selected range of discount rates of 6.5% to 7.5%."  Proxy Statement at 42.

57.     As Allen & Co. used the perpetuity growth method to calculate the terminal value and the Proxy Statement fails to detail the "other information" that Tegna management provided to Allen & Co. and Allen & Co. relied upon in performing its discounted cash flow analysis, upon information and belief, Tegna management provided to Allen & Co. certain "normalized" projections for the run-rate year that Allen & Co. used to calculate the terminal value rather than the 2029E financial projections that appeared on Page 44 of the Proxy Statement.[3]

58.     Because the terminal value was calculated by adding all of the cash flows projected for Tegna into perpetuity the terminal value has a large impact on the results of the discounted cash

---

[3] *See, e.g., IQHoldings, Inc. v. Am. Commer. Lines Inc.*, C.A. No. 6369-VCL, 2013 Del. Ch. LEXIS 234, at *12 (Del. Ch. Mar. 18, 2013) ("In a given company's life cycle, rote normalization may or may not be appropriate after the traditional five year projection period.").

flow analysis and even a small change in the run-rate year projection used to calculate the terminal value would materially impact the valuation implied by the discounted cash flow analysis.

59.     The Proxy Statement also fails to define the date that Allen & Co. assumed to be the "present" for purposes of its analysis.

60.     Although Allen & Co.'s opinion is dated August 18, 2025, the 2025E cash flow projections that were disclosed in the Proxy Statement appear to cover the entire year.  If the "present" value date for the analysis was the beginning of 2025, Allen & Co.'s analysis may have systematically undervalued Tegna by discounting all of its cash flows to more than half a year before Allen & Co.'s analysis was actually performed.  If Allen & Co. assumed a present value date that did not encompass the full year cash flow projection for the 2025 year, then financial projections do not actually disclose the cash flow projection that Allen & Co. used for the 2025 year.

### iii. The Proxy Statement is Materially Misleading and Incomplete Respecting the "Material Relationships" that Existed Between Allen & Co. and Nexstar During the Two-Year Period Leading Up to the Proposed Transaction

61.     The Proxy Statement indicates that, on August 18, 2025, immediately before delivering its fairness opinion and after the Board had already rejected Party A as a suitor, Allen & Co. disclosed to the Tegna Board certain "material relationships with TEGNA and Nexstar, during the approximately prior two-year period, which previously had been reviewed by TEGNA's senior management."  Proxy Statement at 32.

62.     The Proxy Statement indicates that the Board determined that these relationships were not so disabling that they would "impact Allen & Company's ability to act as financial advisor to TEGNA in connection with the proposed transaction with Nexstar."  Proxy Statement at 32.

63.     However, the Proxy Statement ***does not*** indicate that the Board found that these relationships were not material.  Indeed, the Proxy Statement expressly describes Allen & Co.'s relationships as "material relationships with TEGNA and Nestar, during the approximately prior two-year period[.]" Proxy Statement at 32.

64.     The fact that these relationships were not disabling does not mean that they were not material or that should not have been disclosed.[4]

65.     Nonetheless, the portion of the Proxy Statement that would disclose these relationships fails entirely to describe them and states only that Allen & Co. "had not provided investment banking services to TEGNA unrelated to the Merger or to Nexstar for which Allen & Company received compensation":

> TEGNA selected Allen & Company as TEGNA's financial advisor in connection with the Merger based on, among other things, Allen & Company's reputation, experience and familiarity with TEGNA's business and industry.  Allen & Company, as part of its investment banking business, is regularly engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, private placements and related financings, negotiated underwritings, secondary distributions of listed and unlisted securities, and valuations for corporate and other purposes. ***As the Board of Directors was aware, although as of, and during the two-year period prior to, the date of its opinion Allen & Company had not provided investment banking services to TEGNA unrelated to the Merger or to Nexstar for which Allen & Company received compensation, Allen & Company in the future may provide such services to TEGNA, Nexstar and/or their respective affiliates, for which Allen & Company would expect to receive compensation.***  In the ordinary course, Allen & Company as a broker-dealer and certain of its affiliates, directors and officers have invested or may invest, hold long or short positions and may trade, either on a discretionary or non-discretionary basis, for their own or beneficiaries' accounts or for those of Allen & Company's clients, in the debt and equity securities (or related derivative securities) of

---

[4] *See, e.g., City of Sarasota Firefights' Pension Fund v. Inovalon Holdings, Inc.*, 319 A.3d 271, 292 n.118 (Del. 2024) ("There is no rule … that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict.") (quoting *In re John Q. Hammons Hotels Inc. S'holder Litig.*, C.A. No. 758-CC, 2009 Del. Ch. LEXIS 174, at *56 (Del. Ch. 2009)).  Delaware law and federal law apply overlapping materiality standards with respect to the scope of information that should be disclosed in a Proxy Statement.

TEGNA, Nexstar and/or their respective affiliates. The issuance of Allen & Company's opinion was approved by Allen & Company's opinion committee.

Proxy Statement at 42-43.

66. This purported disclosure is materially incomplete and misleading because it fails to describe the relationships that existed between Allen & Co. on the one hand and Tegna or Nexstar on the other. The Proxy Statement acknowledges that Allen & Co., the Tegna Board, and Tegna senior management all agreed that these relationships were material but determined that they were not completely disabling.

67. Because Allen & Co. provided a fairness opinion with the respect to the Proposed Transaction, federal regulations required that the Proxy Statement clearly, accurately, and fully "describe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship[.]" 17 C.F.R. §§ 229.1015(b) (Item 1015), 240.14a-3(a)(1), 240.14a-9, 240.14a-101 Item 14(b)(6); *see also* Financial Regulatory Industry Authority ("Finra") Rule 5150 (requiring that any investment banker's fairness opinion that will be disclosed to public shareholders disclose "any material relationships that existed during the past two years or that are mutually understood to be contemplated in which any compensation was received or is intended to be received as a result of the relationship between the member and any party to the transaction that is the subject of the fairness opinion.").

68. The fact that Allen & Co. did not receive compensation for "investment banking services" during the past two years, Proxy Statement at 42, does not mean that Allen & Co. did not have "any material relationship" with Tegna or Nexstar. Indeed, the Proxy Statement states that Allen & Co. specifically disclosed "material relationships" to the Board immediately before

delivering its fairness opinion but failed entirely to describe those material relationships and any compensation that was received as a result of them.

69.     Item 1015 and Finra Rule 5150 recognize that a company's stockholders must be allowed to evaluate for themselves the financial advisor's fairness opinion in light of the financial advisor's potential conflicts rather than being forced to rely on the directors' determination even when the directors were fully informed about the advisor's potential conflicts throughout the process.  17 C.F.R. § 229.1015(b)(5); Finra Rule 5150(a)(3).

70.     In this case, Tegna's stockholders have even more reason to be skeptical since (i) the Board did not even know about, let alone sign off on, these "material relationships" until moments before Allen & Co. delivered its fairness opinion, and (ii) Tegna director Scott McCune was employed in senior executive roles for twenty years at Coca Cola, where Allen & Co. president Herb Allen has served as a director since 2021, when he replaced his father, Herbert A. Allen, who had served as a director of Coca-Cola for approximately forty years.[5]

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

48.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

49.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

---

[5] *See* Coca-Cola Company, Sch. 14A Def. Proxy Statement and Notice of Annual Meeting of Shareholders on April 20, 2021 at 18; Coca-Cola Company, Sch. 14A Def. Proxy Statement and Notice of Annual Meeting of Shareholders on April 30, 2025 at 15.

authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

50. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

51. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

52. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the misleading Proxy, which attempts to minimize the number of shares voting against the Proposed Transaction.

53. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

54. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted

information identified above in connection with their decision to approve and recommend the Proposed Transaction.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

55.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligent, recklessness, or intentional conduct.

56.     The Company is also deemed negligent, reckless, or intentional as a result of the Individual Defendants' intent in preparing and reviewing the Proxy.

57.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

58.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as

officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

60.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

62.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

63.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

64.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

65.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or taking any steps to consummate the Proposed Transaction, until the Company issues curative disclosures that fully address the deficiencies in the Proxy Statement;

B.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 3, 2025                          **ADEMI & FRUCHTER LLP**

                                        By:   */s/ John D. Blythin*
**OF COUNSEL**                                Shpetim Ademi (Wis. SBN 1026973)
                                              John D. Blythin (Ill. SBN 6281648)
**ADEMI & FRUCHTER LLP**                      3620 East Layton Avenue
Guri Ademi                                    Cudahy, Wisconsin 53110
Jesse Fruchter                                Tel. 414-482-8000
3620 East Layton Avenue                       Fax 414-482-8001
Cudahy, Wisconsin 53110                       sademi@ademilaw.com
Tel. 414-482-8000                             jblythin@ademilaw.com
Fax 414-482-8001
gademi@ademilaw.com                           *Attorneys for Plaintiff*
jfruchter@ademilaw.com

*Attorneys for Plaintiff*